# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
|  | ) | Criminal No. 10-10075-PBS |
| v. | ) | |
|  | ) | |
| JUNIOR GRAY, | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

January 14, 2015

Saris, U.S.D.J.

Defendant Junior Gray, currently serving a term of supervised release, seeks to vacate his conviction and set aside his guilty plea in light of the troubling scandal surrounding chemist Annie Dookhan and the William F. Hinton Drug Laboratory in Jamaica Plain. Gray argues that his plea was invalid because the government failed to inform him of Dookhan's misconduct before he pleaded guilty. (Docket No. 67). If he had known about the scandal, Gray says that he would have chosen to go to trial instead of plead guilty. The government opposes Gray's motion and has requested summary dismissal. (Docket No. 84). For the following reasons, Gray's Motion to Vacate Pursuant to 28 U.S.C. § 2255 is **DENIED**. The government's request for summary dismissal is **ALLOWED**.

1

**FACTUAL AND PROCEDURAL BACKGROUND**

Gray seeks to set aside his conviction for one count of possession of cocaine base (also known as crack cocaine) with intent to distribute and distribution of cocaine base, in violation of 21 U.S.C. § 841(a)(1). The facts underlying his conviction are largely undisputed.

On February 27, 2010, the Boston Police Department was investigating a drug dealer known as "E" who was selling crack cocaine in the area around the Pine Street Inn on Harrison Avenue. The police believed that "E" was using a certain telephone number to conduct his sales. As a result, an undercover officer called the number to set up a controlled drug buy. Gray answered the phone and agreed to sell $60 worth of crack cocaine to the undercover near the Pine Street Inn. While the undercover was on his way over, Gray called and said to hurry up because he was waiting at a Mobil gas station.

Soon after arriving at the gas station, the undercover observed Gray pull up in a Honda Civic. After entering and exiting the convenient store, Gray looked around as if he were trying to find someone. The undercover officer yelled, "E!, I'm right here." Gray then asked the undercover a series of questions and took him around the corner to a more secluded area. The undercover officer said that he wanted "three," but Gray demanded to see the money first. The undercover officer complied and

2

handed Gray $60 in prerecorded bills, which Gray inspected under a street lamp. Gray then spit out of his mouth three plastic bags of crack cocaine and gave them to the undercover officer. The undercover thanked Gray and began walking away, alerting the other officers in the area that the sale had been completed.

As Gray got back into his car to leave, he was promptly blocked off by an unmarked police car while another officer approached Gray's driver's side window. Gray put the Honda in reverse and attempted to flee, but the car smashed into a curb. The officers then arrested Gray and recovered the $60 of buy money. They also frisked Gray and felt a hard object near his buttocks. Gray said, "You don't feel nothing." After the officers brought Gray back to the police station, they conducted a strip search, which revealed 20 bags of crack cocaine similar to the three bags the undercover had purchased from Gray earlier. The officers visually identified the drugs as crack cocaine. They also conducted field tests using samples from the controlled drug buy and strip search. Both tests returned positive results for crack cocaine.

Relevant here, the evidence next went to the Hinton Drug Laboratory in Jamaica Plain, former workplace of chemist Annie Dookhan. But Dookhan was <u>not</u> the primary chemist on Gray's case. Rather, Daniela Frasca was assigned as the primary chemist for both sets of drugs. As the primary chemist on the case, Frasca's

3

job was to visually examine the substances, document the gross and net weights, and perform all presumptive tests, including reagent spot/color and microcrystalline tests. Frasca was also responsible for keeping both sets of drugs locked in her personal lab cabinet. After completing the initial analysis, Frasca prepared small samples of the substance to be given to a confirmatory chemist, who in this case was Annie Dookhan. Dookhan's responsibility as confirmatory chemist was to run the sample through a gas chromatography-mass spectrometer (GC/MS) machine. At no time did Dookhan have access to the drugs other than the vials prepared by Frasca. See Gov't Request for Summary Dismissal Exh. 10 (Frasca Affidavit). After analysis was complete, the lab returned two certificates signed by Frasca and Dookhan stating that the evidence from the controlled drug buy and strip search altogether contained 3.43 grams of crack cocaine.

On December 17, 2010, Gray pleaded guilty to one count of possession with intent to distribute and distribution of cocaine base. At the plea hearing, he did not disagree with the government's allegations that he had been in possession of crack cocaine and distributed it to the undercover officer in exchange for $60. The Court also specifically asked Gray, "Were you the person who spit the crack cocaine out of your mouth?" and he responded, "Yes." At sentencing, Gray also did not object to the

Presentence Report's statement that the drugs purchased and seized from him were crack cocaine. Based on the drug weight and a three-level reduction for acceptance of responsibility, Gray's total offense level was 13. Combined with a criminal history category of III, Gray's guidelines range was 18-24 months of imprisonment. The Court sentenced Gray to 24 months of imprisonment and five years of supervised release.

In August 2012, the news broke that chemist Annie Dookhan had falsely certified drug test results and tampered with samples at the Hinton Drug Lab. Although there was no direct evidence that Dookhan had committed any wrongdoing in his case, Gray filed a 28 U.S.C. § 2255 motion, (Docket No. 67), which was stayed at the parties' request until the Massachusetts Inspector General (OIG) released its report following an investigation of the lab. (Docket No. 68, 70). This report was released on March 4, 2014, and states, in relevant part:

> Dookhan was the sole bad actor at the Drug Lab. Though many of the chemists worked alongside Dookhan for years, the OIG found no evidence that any other chemist at the Drug Lab committed any malfeasance with respect to testing evidence or knowingly aided Dookhan in committing her malfeasance. The OIG found no evidence that Dookhan tampered with any drug samples assigned to another chemist even when she played a role in confirming another chemist's test results.
> . . .
> [A]ll samples in which Dookhan was the primary chemist should be treated as suspect and be subject to careful review
> . . .

> [T]he OIG found no evidence to support treating cases in which Dookhan confirmed another chemist's results with any increased suspicion about Dookhan's involvement.[1]

The government filed its opposition on November 19, 2014 and requested summary dismissal. (Docket No. 84). Gray's motion to vacate is now ripe for resolution.

## LEGAL STANDARDS

Title 28 U.S.C. § 2255(a) allows for a prisoner to collaterally attack his sentence when it "(1) was imposed in violation of the Constitution, or (2) was imposed by a court that lacked jurisdiction, or (3) exceeded the statutory maximum, or (4) was otherwise subject to collateral attack." David v. United States, 134 F.3d 470, 474 (1st Cir. 1998). The burden is on the petitioner to make out a case for relief under § 2255. Id.

Generally speaking, "a voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked." Mabry v. Johnson, 467 U.S. 504, 508 (1984), overruled in part on other grounds by Puckett v. United States, 556 U.S. 129 (2009). But the First Circuit has held that § 2255 motions are "not necessarily a dead end" for prisoners who pleaded guilty. Wilkins v. United States, 754 F.3d 24, 28 (1st Cir. 2014). For example, "a prisoner

---

[1] The OIG report is available at http://www.mass.gov/ig/publications/reports-and-recommendations/2014/investigation-of-the-drug-laboratory-at-the-william-a-hinton-state-laboratory-institute-2002-2012.pdf.

can collaterally attack his sentence on the ground that his guilty plea was not knowing or voluntary if is his claim is based on evidence not available to him at the time of the plea." Ferrara v. United States, 456 F.3d 278, 289 (1st Cir. 2006).

To prevail on this ground, a defendant must make two showings. "First, he must show that some egregiously impermissible conduct (say, threats, blatant misrepresentations, or untoward blandishments by government agents) antedated the entry of his plea." Id. at 290. "Second, he must show that the misconduct influenced his decision to plead guilty or, put another way, that it was material to that choice." Id. To satisfy this second prong of materiality, a defendant must establish "a reasonable probability that, but for [the misconduct], he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985). "A reasonable probability is a probability sufficient to undermine confidence in a belief that the petitioner would have entered a plea." Ferrara, 456 F.3d at 294.

"In mounting an inquiry into these elements, a court must consider the totality of the circumstances surrounding the plea." Id. at 290. Relevant factors include, but are not limited to, whether the withheld information: (1) would have detracted from the factual basis used to support the plea; (2) could have been used to impeach a witness whose credibility may have been

outcome-determinative; (3) was cumulative of other evidence already in the defendant's possession; (4) would have influenced counsel's recommendation as to the desirability of accepting a particular plea bargain; and (5) was outweighed by the benefits of entering into the plea agreement. Id. at 294.

Wilkins is a recent § 2255 case where Dookhan was the primary chemist analyzing a prisoner's drug samples. The First Circuit said that the defendant must "convince us that there is a reasonable probability that, considering the totality of the circumstances, he would not have pleaded guilty had he known of Dookhan's transgressions." 754 F.3d at 31. The Wilkins Court concluded that the defendant had not met this burden based on several factors. For starters, there was "powerful circumstantial evidence" of the defendant's guilt, and the "transaction followed the pattern of the prototypical street corner drug buy." Id. at 29. Also, the government had commissioned a second round of testing on samples that the district court found were untouched by Dookhan, which tested positive for cocaine. Id. These results "set to rest any real doubt about the nature of the merchandise purveyed by the petitioner." Id. Finally, the defendant had admitted his factual guilt in open court at the time he changed his plea, and he did not attempt to explain it away or make any assertion of factual innocence. Id. at 30. As a result, the Court found that the defendant had not satisfied the Ferrara

materiality standard.

## **DISCUSSION**

Applying these legal standards, Gray is not entitled to § 2255 relief because he cannot establish the materiality of the alleged government misconduct. Specifically, the Court does not find a reasonable probability that Gray would have proceeded to trial instead of pleading guilty had the government disclosed the Annie Dookhan scandal to him. The Court bases this conclusion on several factual findings.[2]

To begin with, Gray has not argued that the substance he sold and possessed was, in fact, something other than crack cocaine. Nor, on this record, could he. At his change of plea hearing, Gray admitted in open court that he had been in possession of crack cocaine and sold it to the undercover officer in exchange for money. The Court asked Gray specifically, "Were you the person who spit the crack cocaine out of your mouth?" and he responded under oath, "Yes." These admissions are "entitled to significant (albeit not dispositive) weight when, as now, he seeks to vacate that plea through a collateral attack." Id. at 30. "And such an admission is especially compelling because the petitioner neither attempts to explain it away nor makes any

---

[2]Because Gray fails to satisfy Ferrara's materiality prong, it is unnecessary to decide whether the government's alleged misconduct constituted "egregiously impermissible conduct" under Ferrara's conduct prong. 456 F.3d at 290.

9

assertion of factual innocence." Id.; see also United States v. Parrilla-Tirado, 22 F.3d 368, 373 (1st Cir. 1994) (explaining that the absence of a claim of innocence "cuts sharply against allowing [a defendant's] motion to withdraw his guilty plea").

Second, the evidence of Gray's guilt facing him at trial is overwhelming. On the night of his arrest, police officers recovered 23 bags of drugs altogether from Gray, three from the controlled drug buy and 20 concealed in Gray's buttocks. Police officers visually identified both sets of drugs as crack cocaine. They also conducted a field test on each set of drugs, and both tests returned positive results for crack cocaine. These observations all took place before the drug samples were sent to the Hinton Drug Lab.

Gray's conduct was also consistent with the actions of a drug dealer who believed he was selling real crack cocaine instead of a knock-off imitation. Gray took the undercover to a more secluded area and demanded to see the money before he would produce any drugs. He also hid the crack cocaine in his mouth and buttocks. And when officers arrested him, he tried to flee and lied to them when they felt something hard hidden beneath his clothing. These facts suggest that Gray knew he was selling contraband and did not want the police to find his stash of illegal drugs.

Meanwhile, the impeachment value of the Dookhan scandal is

far less powerful than Gray suggests. The Court recognizes that any drugs analyzed by Dookhan in her role as primary chemist may be suspect, given that she routinely tampered with evidence and produced fraudulent results during her time at the lab. But Dookhan was not the primary chemist here. Rather, Daniela Frasca was the primary chemist and retained possession of all the evidence from the time the case was assigned to her until the completion of testing. Dookhan's only interaction with the case involved running the samples provided by Frasca through the GC/MS machine to confirm the preliminary results. And the OIG has found no evidence to support treating cases in which Dookhan confirmed another chemist's results with any increased suspicion.

Gray responds that there have also been a number of systematic problems at the Hinton Drug Lab, including (1) lax lab security; (2) gaps in chain-of-custody documentation; and (3) failure to disclose when chemists would run a sample through the GC/MS machine multiple times because of inconsistent findings. He also observes that Dookhan had access to the main evidence safe at the Hinton Drug Lab, which meant that she could tamper with any sample, even those not specifically assigned to her. This argument is not without force. It is easy to imagine how Gray could have used the Dookhan scandal and the systematic problems at the Hinton Drug Lab to score points while cross-examining the government's witnesses at trial. But there is no evidence to

suggest that these problems affected the results in Gray's case. See Wilkins, 754 F.3d at 29 (rejecting petitioner's argument that "Dookhan's wrongdoing was so malignant . . . that it infected everything that was at the Hinton Lab"). In fact, the government submitted the GC/MS control cards from Gray's case, both of which show that the confirmatory testing was done on the GC/MS machine only once. See Gov't Request for Summary Dismissal Exh. 9. As a result, this evidence of generalized failings at the Hinton Drug Lab is not sufficient on its own to establish materiality. See Ferrara, 456 F.3d at 294 (listing impeachment of a witness whose credibility may have been "outcome-determinative" as just one of the "multiplicity of factors [that] may influence a defendant's decision to enter a guilty plea"). Without specific evidence that the results in Gray's case are fraudulent, the government cannot find a reasonable probability that Gray would have proceeded to trial instead of plead guilty.

To put any doubts to rest, the government has retested the drugs recovered from the drug buy and strip search, and these results have all come out positive for crack cocaine. These results are particularly significant because the government tested bags that had never previously been opened for analysis by anyone-including Frasca, Dookhan, and the police. See Gov't Request for Summary Dismissal Exh. 7 (police report observing that one of the three bags from the controlled drug buy and 17 of

the 20 bags from the strip search appeared intact and unopened). As a result, there is little doubt that Gray was in possession of authentic crack cocaine on the day of his arrest in February 2010.

In sum, this case turns on whether Gray can establish a reasonable probability that he would have decided to go to trial instead of pleading guilty had he known of the scandal involving Dookhan and the Hinton Drug Lab. After evaluating the totality of the circumstances, the Court finds that knowledge of the scandal would not have affected Gray's calculus of the costs and benefits of pleading enough to satisfy Ferrara's materiality prong. Even with knowledge of the Dookhan scandal, Gray's decision to plead guilty would have still been black and white. The Court finds no shades of Gray (or fifty) in the record.

## ORDER

Gray's Motion to Vacate Pursuant to 28 U.S.C. § 2255 is **DENIED**. The government's request for summary dismissal is **ALLOWED**.

/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge